IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ROOSEVELT KENNETH THOMPSON,<br><br>Defendant. | CR 20–24–M–DWM<br><br>OPINION<br>and ORDER |

    This case poses interesting questions about the limits on law enforcement in executing a lawful traffic stop. The question is whether all professional stops are akin to constitutional stops. While not always the case, the answer here is that professionalism and the Constitution align.

    Defendant Roosevelt Thompson is charged with felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Indict., Doc. 1.) The charge arises out of February 4, 2020 traffic stop wherein Officer Casey Harvey of the Missoula Police Department pulled over a Lexus in which Thompson was a passenger. Thompson seeks to suppress his arrest and all related evidence on the grounds that the stop was unlawful, (Doc. 16), and unlawfully prolonged, (Doc. 17). A hearing was held on August 25, 2020 at which Officer Harvey testified. For the reasons discussed on the record and those provided below, the motions are denied.

1

## FACTUAL BACKGROUND

The facts are taken from Officer Harvey's written case report, (Doc. 16-1), his testimony at the August 25 hearing, and his body cam, which provides a 48-minute audio and visual recording of the incident. That recording begins when the traffic stop starts and ends once Thompson is taken away in a patrol car.[1]

Around 10:00 p.m. on February 4, 2020, Officer Harvey was patrolling on the westside of Missoula, Montana. He was traveling northbound on Russell Street when he observed a known "doper" vehicle traveling southbound. He turned around to follow it but was unable to locate it. He ultimately circled around the block to continue traveling northward on Russell. While looking for the "doper" car, Officer Harvey had seen a silver Lexus in the same neighborhood. When he returned to Russell Street he ended up behind the Lexus. Although he was too far back to read the license plate, he—without speeding up—naturally arrived at the stop light on West Broadway and Russell and was able to read the plate numbers on the Lexus. At that point, Officer Harvey ran the plates through the system to see if the registration was current. According to his testimony, he ran the plates as a matter of course, not because of any specific suspicion regarding the Lexus or its passengers. Because his computer was running slow, Officer Harvey turned east on Broadway before he received the results. The Lexus had turned west on

---

[1] A detailed chronology of the video footage is provided in an Appendix.

Broadway.  Contrary to the defense's suggestion, Officer Harvey had no ephemeral hunch or suspicion about the Lexus or any wrongdoing by its passengers.  When the results returned with an expired registration, Officer Harvey did a U-turn from his eastbound lane on Broadway to initiate a traffic stop on westbound Broadway.

There were three occupants in the vehicle, Catherine Field was driving, Lukita Farmer was in the front passenger seat, and Roosevelt Thompson, the defendant, was in the back seat on the driver's side.  Officer Harvey approached Field on the driver's side of the car and immediately informed her that he pulled her over because her registration expired six months before.  Field apologized and provided him with her paper learner's permit, specifically recognizing that it required that someone in the car have a valid driver's license.  The video shows Field was uncomfortable if not stressed by the stop, even though Officer Harvey's approach was friendly and non-demanding.  Officer Harvey then asked Farmer, the front passenger, for a valid ID or driver's license.  She had neither.  The ostensible reason for the question was to see if the Lexus had a licensed driver and, if so, Field's driving with a learner's permit would have been lawful.  Officer Harvey then asked Farmer for her name and date of birth, which she provided.  He asked Field where they were going and where they had come from.  After Field explained that they were going to a friend's house, Officer Harvey started to walk back to his patrol car.  Before reaching his car, however, he walked back to the Lexus to ask

the backseat passenger, Thompson, for a license. Thompson said he did not have one. Officer Harvey again asked everyone in the car whether anyone had a valid driver's license on the grounds that he was "trying to get [Field] out of trouble." They all responded in the negative, no one in the car had a current driver's license.

Officer Harvey then asked Thompson again if he had any form of identification. Thompson said he did not. Officer Harvey asked Thompson for his name and, because he could not hear very well, asked Field to roll down Thompson's window. Thompson provided his name and date of birth. Officer Harvey reaffirmed, "so you don't have a license either?" Thompson confirmed that he did not. Officer Harvey then said, "If someone had a license in the car then she'd [Field] be okay."

Officer Harvey was then about to walk back to his vehicle when Thompson, unprompted, said that he was "twitching and shit" because he had previously been shot in the head, not because he was "trippin." Officer Harvey then asked everyone in the car if there were any weapons in the car. No one responded verbally, the two front seat passengers avoided looking at him, and Thompson sort of shook his head. Officer Harvey then asked if there was anything illegal in the car. The front passenger and Thompson shook their heads, but again no one responded verbally.

At this point, about six minutes after the stop commenced, Officer Harvey

returned to his patrol car and ran all three occupants through the system, running both a warrant check and a probation search. In that process, he learned that the driver was on probation and that Thompson had a previous weapons charge out of Ohio and was on parole. Nine minutes later—approximately fifteen minutes into the traffic stop—Officer Harvey returned to the Lexus and asked Field to get out of the car. She indicated that the driver's door was broken so she had to get out through the passenger side. While she did that, Officer Harvey asked Thompson if he was on parole. Thompson confirmed that he was and, with some prodding, indicated in a colorful ramble that his previous conviction was for "tampering with evidence or some shit."

Officer Harvey then spoke to Field on the sidewalk while walking toward his patrol car. Field admitted that she was on probation for felony theft, she had missed treatment court earlier that day, and she and the other occupants of the vehicle had used methamphetamine. When Officer Harvey stated that he could tell as much from speaking to Thompson, Field volunteered that "he has a gun on him." She then denied that there were any other guns or drugs in the car. Field was placed in a patrol car to wait. For the next six minutes or so, the officers discussed the fact that Thompson was likely armed and prepared to remove him from the Lexus. Officer Harvey armed himself with an AR15 and backup officers arrived at the scene. One of those officers ordered Thompson out of the vehicle

and, once out, Thompson asked if he could say something and then stated, "I have a weapon on me." The officers told Thompson not to reach for the weapon, directed him to the curb, had him lay on the ground, removed the firearm, and handcuffed him. Thompson was cooperative the entire episode. They also removed and handcuffed the front seat passenger from the Lexus without incident. In addition to a firearm, officers found a glass pipe in Thompson's pocket. All of this can be heard but not seen on Officer Harvey's body cam because his AR15 is in the way of the video camera.

After everyone was out of the car, the officers "cleared" it and then a K9 unit performed a "sniff." The dog "hit" generally on the car, which the officers expected in light of the occupants' admitted methamphetamine use. Officer Harvey then spoke to Field again and searched the Lexus, recovering a baggie of methamphetamine and a capped syringe.

## ANALYSIS

### I. Legality of Stop

Thompson first argues that the initial stop was unlawful because it is unclear exactly why Officer Harvey initiated the traffic stop, intimating that it was because he made an unsubstantiated connection between the Lexus and the "doper" car he had seen earlier that night. Thompson's argument misses the mark. "[W]hen police officers see a license plate in plain view, and then use that plate to access

additional non-private information about the car and its owner, they do not conduct a Fourth Amendment search." *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007). Here, Officer Harvey did not need an articulable reason to run the Lexus's plates. Once he discovered the registration was expired, he was authorized to execute a lawful traffic stop. *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Choudhry*, 461 F.3d 1097, 1098 (9th Cir. 2006).

Thompson's three arguments to the contrary are unpersuasive. First, he relies on a dissent from the Sixth Circuit to argue that even if a person has no privacy interest in the plate itself, police should not be permitted to run a computer search without heightened suspicion. *See United States v. Ellison*, 462 F.3d 557, 567–69 (6th Cir. 2006) (Moore, J., dissenting). The Ninth Circuit explicitly rejected Judge Moore's analysis in *Diaz-Castaneda* and sided with the majority. *See* 494 F.3d at 1151–52. Second, Thompson argues that it was unclear when Officer Harvey ran the registration. This factual question was resolved at the August 25 hearing. Officer Harvey ran the plate once he pulled up near the Lexus at the West Broadway stoplight and only discovered the registration was expired after he had already turned the opposite direction. Finally, Thompson argues that Officer Harvey had a duty under Montana law to tell the driver the reason for the stop. *See* Mont. Code Ann. § 46–5–401(1) ("[T]he officer shall as promptly as possible inform the person of the reason for the stop" unless there is an emergency

7

or safety concern.). But, as defense counsel conceded at the hearing, Officer Harvey did so. Even if the reason for that stop evolved, Officer Harvey had no duty to inform the occupants of the vehicle of that fact.[2]

Because the stop itself was lawful, Thompson's first motion to suppress (Doc. 16) is denied.

## II. Duration of Stop

Thompson argues next that even if the stop was lawful to begin with, Officer Harvey unlawfully prolonged it after he determined that Field had only a learner's permit and no one else in the car had a valid driver's license. (Doc. 17.) Though a closer question, this motion also fails.

The Supreme Court held in *Rodriguez v. United States* that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 575 U.S. 348, 350 (2015). In that case, the police lawfully stopped a driver for briefly veering onto the shoulder of the road. *Id.* After writing and then explaining a written warning to the driver, returning the driver's and passenger's documents, and

---

[2] If that were not the case, Officer Harvey's failure to comply with state law would not, on its own, be sufficient to justify suppression. *See United States v. Cormier*, 220 F.3d 1103, 1111 (9th Cir. 2000) ("The general rule . . . is that evidence will only be excluded in federal court when it violates federal protections, such as those contained in the Fourth Amendment, and not in cases where it is tainted solely under state law.").

reaching the point where all the reasons for the stop were "out of the way," the officer instructed the driver to turn the car off and conducted a dog sniff. *Id.* at 351–52. The Court held that the dog sniff—although it added only 7 to 10 minutes to the stop—unreasonably prolonged the stop because it "'prolonged [the seizure] beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

More recently, the Ninth Circuit applied *Rodriguez* in the context of a traffic stop in which a passenger refused to identify himself. *United States v. Landeros*, 913 F.3d 862, 866–87 (9th Cir. 2019). The court determined that officers cannot simply extend a stop so long as the circumstances are "reasonable" but rather "a traffic stop may be extended to conduct an investigation into matters other than the original traffic violation only if officers have reasonable suspicion of an independent offense." *Id.* at 867. The court also reiterated that the chronology of events does not matter: "[w]hat mattered was the added time, not at what point, in the chronology of the stop, that time was added.'" *Id.* at 866.

Under *Rodriguez* and *Landeros* Officer Harvey was permitted within the mission of the lawfully initiated stop to ask Field for her license and whether she could legally operate the vehicle. Once the answer to that question was no, any investigation into Thompson's driver's license status, identity, and records history "was permissible only if it was (1) part of the stop's 'mission' or (2) supported by

9

independent reasonable suspicion." *Id.* at 868. Under the unique circumstances of this stop, Thompson's motion fails under both inquiries.

### A. "Mission" of the Stop

"When stopping an individual for a minor traffic violation, an officer's mission includes ordinary inquiries incident to the traffic stop." *Id.* (internal quotation marks omitted). "These involve 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance,' and each shares 'the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.'" *Id.* (quoting *Rodriguez*, 575 U.S. at 349). On the other hand, "[a] demand for a passenger's identification is not part of the mission of a traffic stop" as "[t]he identity of a passenger . . . will ordinarily have no relation to a driver's safe operation of a vehicle." *Id.* Unlike *Landeros*, however, ascertaining whether Thompson had a valid driver's license was undoubtedly part of the stop's original "mission" as Field could only legally drive the vehicle in the presence of a licensed driver. *See United States v. Burrus*, 402 F. Supp. 3d 116, 124–25 (W.D. Penn. 2019) (distinguishing *Landeros* in case where driver had suspended license and officer spoke to passenger to ascertain whether passenger could legally move car). In this case, Officer Harvey was permitted to ask Thompson if he had a valid driver's license as part of the original stop.

10

The next question is whether Officer Harvey could ask Thompson for his name and date of birth. In *Diaz-Castaneda*, the Ninth Circuit determined that police are permitted to *ask* the occupants of a vehicle—including passengers—for identification without conducting a Fourth Amendment search or seizure. 494 F.3d at 1152. *Landeros* then specifically avoided determining whether this "precedent remains valid after *Rodriguez*." 913 F.3d at 870. But at least one district court has determined that it is. *See United States v. Hicks*, 2019 WL 2905047, at *10–11 (D. Nev. July 5, 2019) ("I . . . do not read *Landeros* to categorically prohibit officers from *requesting* a passenger's ID during a traffic stop without reasonable suspicion that he has committed a crime."). Thus, it seems that so long as it did not "add time" to the stop, Officer Harvey was permitted to ask Thompson for his name. *See United States v. Maffei*, 417 F. Supp. 3d 1212, 1221 (N.D. Cal. 2019). While Thompson could have refused to answer under *Landeros*, he did not do so here. Had this happened, the government concedes "[t]hat would be a completely different issue."

The question then becomes whether Officer Harvey could run Thompson's name through his system as part of the original stop. This presents a close question. Though not addressed in *Landeros*, district courts have come down differently on this issue. The Northern District of California determined that it was not part of a vehicle stop's original "mission" when officers pulled a vehicle over

11

for a broken taillight and ran a records check on the passenger. *Maffei*, 417 F. Supp. 3d at 1222. The court clarified that even though it turned out the driver of that vehicle could not drive because of a suspended license, there was no indication that the records check was run to see if the passenger could drive the vehicle in his stead. *Id.* On the other hand, other courts have determined that a routine records check of a passenger may be appropriate if it does not prolong the stop and is run to ascertain whether any of the other occupants could legally drive the vehicle. *See Hicks*, 2019 WL 2905047, at *9–10; *Burrus*, 402 F. Supp. 3d at 123–24; *United States v. Hampton*, 374 F. Supp. 3d 1115, 1121 (D. Kan. 2019).

Here, Officer Harvey did not say that he ran Thompson or Farmer's information to see if they could lawfully drive the vehicle. While he testified that he routinely runs passenger information, he said that in this case he had a reasonable suspicion of other drug-related criminal activity based on Thompson's spontaneous explanation for "twitching" and the behavior of the all the Lexus's occupants. This search, therefore, fell outside the mission parameters of the original stop, requiring independent reasonable suspicion. *See United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015) (internal quotation marks omitted); *see also United States v. Mati*, 2020 WL 3128903, at *6 (N.D. Cal. June 12, 2020) (finding probation/parole status is not "casual conversation" tied to vehicle safety).

### B. Independent Reasonable Suspicion

"Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form the basis for *particularized* suspicion." *Landeros*, 913 F.3d at 868 (internal quotation marks omitted). It is assessed on the totality of the circumstances, *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc), with deference given to the inferences drawn by the officer at the scene, *United States v. Valdes-Vega*, 738 F.3d 1074, 1077–79 (9th Cir. 2013). Here, after Officer Harvey asked Thompson for his name (which is permissible within the scope of the original stop as discussed above), Thompson volunteered unprompted that he was "twitching and shit" because had previously been shot in the head not because he was "trippin." As argued by the government, this was "[a]n odd statement given the circumstances of the investigation." (Doc. 21 at 10.) Officer Harvey's case report and hearing testimony indicate that he observed physical indicators on Thompson, such as involuntary muscle contractions consistent with ingesting methamphetamine. (*See* Doc. 16-1 at 1.) Further, when asked if there were weapons or illegal items in the car, the occupants all avoided eye contact and gave no verbal response, yes or no. Thus, at this point, Officer Harvey developed an objective and reasonable inference to investigate Thompson and the other occupants for a potential crime beyond the immediate traffic violation. As a result,

13

it was appropriate for Officer Harvey to run all of them—including Thompson—through the system, discovering previous offenses and probation/parole status.

But even so, Thompson's possession of the firearm was discovered during Officer Harvey's continued lawful investigation of his traffic stop of Field, not his records check of either Farmer or Thompson. After he ran their information, Officer Harvey returned to the vehicle and asked Field to step out of the car. At this point he knew she had a warrant—information he was permitted to obtain about a driver of a lawfully stopped vehicle. *See Landeros*, 913 F.3d at 868. She agreed but indicated that she had to get out through a passenger door. Once Field was on the sidewalk, she—for lack of a better term—voluntarily spilled her guts. At Officer Harvey's limited inquiry, she admitted to missing treatment court, doing methamphetamine with the other occupants in the car, and then volunteered that Thompson had a gun. Officer Harvey's conversation with Field all fell squarely within the original "mission" of the stop. And once he learned that a firearm was present, both *Rodriguez* and *Landeros* recognize that "an officer *may* need to take certain negligibly burdensome precautions in order to complete his mission safely." *See Landeros*, 913 F.3d at 868. It was therefore lawful to remove Thompson from the vehicle to secure the firearm.

Accordingly, Thompson's second motion to suppress (Doc. 17) is denied.

## CONCLUSION

Officer Harvey acted within the bounds of the Fourth Amendment. And as mentioned at the hearing, his conduct was refreshing. He was unerringly polite to the occupants of the vehicle, he did not swear or threaten them, and, ultimately, treated them professionally. Though this does not bear on the Fourth Amendment analysis, his and the police department's conduct are noteworthy. Not all police traffic stops are done professionally. But that does not mean such stops are unconstitutional. Likewise, not all professional traffic stops are constitutional. But here, the two concepts coincide; it was a professional and constitutional stop.

Based on the foregoing, IT IS ORDERED that Thompson's motions to suppress (Docs. 16, 17) are DENIED.

DATED this 25th day of August, 2020.

_____
Donald W. Molloy, District Judge
United States District Court